IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| MARTIN TROTTIER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:20-CV-186-Z-BR |
| | § | |
| FIELDCORE SERVICES SOLUTIONS, | § | |
| LLC *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Trottier's ("Plaintiff") Motion for Court-Authorized Notice

("Motion") (ECF No. 97), filed on July 30, 2021. Plaintiff seeks to bring his claims in this case as

a "collective action" under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). After

considering the parties' pleadings, evidence, and relevant law, the Court **DENIES** the Motion.

### FACTUAL BACKGROUND

Plaintiff[1] alleges during the last three years, Granite Services, International, Inc. and

FieldCore Services Solutions, LLC (collectively "Defendant" or "FieldCore") paid its technical

field advisors ("TFAs") in violation of the FLSA, 29 U.S.C. §§ 201 *et seq*. The FLSA requires

covered employers to pay nonexempt employees overtime rates for time worked in excess of

statutorily defined hour limits. *Id.* § 207(a). Employers that violate this overtime-compensation

requirement may be sued in a collective action by "any one or more employees for and in behalf

of himself or themselves and other employees similarly situated." *Id.* § 216(b).

---

[1] Other interested parties include Mark Majors, Macon Morgan, Raymond Truesdale, and Robert Mackenroth. *See* ECF No. 30.

Plaintiff asks the Court to provide notice to proposed putative collective-action members consisting of all Defendant's TFAs who worked in Texas during the past three years and were paid under the XHOUR pay practice. ECF No. 97 at 7. FieldCore  — formerly Granite[2] — provides technical and support services to the energy industry. ECF No. 101 at 8. TFAs are the directors of installation projects and maintenance projects for FieldCore clients. *Id.* at 9. TFAs lead work crews, interface with FieldCore service managers and customers, and ensure proper processes are followed. *Id.* FieldCore employs five TFA specialty types in its gas and stream-power segment. ECF No. 97 at 8; ECF No. 101 at 9. Those types include gas turbine, steam turbine, generator specialist, excitation, and controls. ECF No. 101 at 9. Most TFAs are trained only in one of those five areas. *Id.* FieldCore employed about 300 TFAs in Texas over the last three years in over 80 locations. *Id.* at 11.

TFAs may progress through four levels, each with increasing responsibilities. *Id.* Most in the TFA I role still have training to complete. *Id.* Those in the TFA II role generally lead shifts and small projects. *Id.* Those in the TFA III role are site leads and lead larger projects. *Id.* at 10. Those in the TFA IV role are project managers, responsible for running major projects. *Id.* FieldCore assigns TFAs based on their specialty, experience, and skill level. *Id.* It takes about six to twelve weeks to progress from TFA I to II, three to five years to go from II to III, and eight to ten years to go from III to IV. *Id.* at 9–10.

FieldCore offers different retainer agreements to TFAs. *Id.* The agreement at issue (the "Payment Plan") — called the "XHOUR plan" by Plaintiff and "Retainer V1 plan" by Defendants — provides an employee a predetermined annual salary. ECF No. 97 at 8; ECF No. 101 at 11. An employee under the Payment Plan receives his salary each week, regardless of hours

---

[2] In April 2017, Granite converted to an LLC and changed its name to FieldCore. ECF No. 101 at 8.

worked. ECF No. 101 at 11–12. An employee can earn compensation on top of his salary if he exceeds his annual billable-hour goal. *Id.* at 12. An employee who exceeds his annual goal is given a predetermined hourly rate for each billable hour worked more than his goal. *Id.* Each employee's annual goal is individually determined. *Id.*

Defendant employed Plaintiff as a TFA. ECF No. 101 at 13. Under the Payment Plan, Defendant paid Plaintiff a weekly salary of $1,586.40, no matter how many hours he worked. ECF No. 81 at 1; ECF No. 101 at 12 (citing ECF No. 97-3 at 7). In 2017, Plaintiff received $143,244.05. ECF No. 101 at 12 (citing ECF No. 101-4). In 2018, he received $183,767.70. *Id.* (citing ECF No. 101-5). In 2019, he received $170,619.53. *Id.* (citing ECF No. 101-6). And in 2020, Plaintiff received $182,241.02. *Id.* (citing ECF No. 101-7).

### LEGAL ANALYSIS

The FLSA protects employees by establishing a minimum hourly wage, maximum work hours, and overtime compensation for work beyond 40 hours per week. *See* 29 U.S.C. §§ 206(a)(1), 207(a). Section 216(b) of the FLSA states employees may proceed collectively when they are "similarly situated." But the statute does not define "similarly situated." 29 U.S.C. 216(b).

A similarly situated party must "opt-in" to the lawsuit by written consent. *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 173 (1989).[3] An employee must receive "accurate and timely notice" to benefit from a collective action. *Id.* at 170. A district court may oversee the notice and opt-in process. *See id.* at 174. Because "written consent is required by statute, a court's notice-sending authority is 'inevitable' in cases involving numerous potential plaintiffs." *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 435 (5th Cir. 2021) (quoting *Hoffmann-La Roche*, 493 U.S.

---

[3] *Hoffmann-La Roche* involved the Age Discrimination in Employment Act. That law contains a provision identical to Section 216(b) of the FLSA. Courts consistently apply *Hoffmann-La Roche* to FLSA cases. *See generally, e.g., Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430 (5th Cir. 2021); *In re JP Morgan & Chase*, 916 F.3d 494 (5th Cir. 2019).

at 171). A district court's "'intervention in the notice process' cannot devolve into 'the solicitation of claims.'" *Id.* at 436 (quoting *Hoffmann-La Roche*, 493 U.S. at 174). The court "must take care to avoid even the appearance of judicial endorsement of the merits of the action." *Id.* (quoting *Hoffmann-La Roche*, 493 U.S. at 174). It is the court's job to ensure "notice goes out to those who are 'similarly situated,' in a way that scrupulously avoids endorsing the merits of the case." *Id.* at 440.

To determine "whether and to whom notice should be issued[,] . . . the district court needs to consider all of the available evidence." *Id.* at 442. Certain facts relevant to merits issues may also be relevant to determination of the similarly situated issue. *See id.* at 442–43. "When determining whether plaintiffs are similarly situated," the court "need not ignore such evidence to avoid using it for the wrong purpose." *Torres v. Chambers Protective Servs., Inc.*, No. 5:20-CV-212-H, 2021 WL 3419705, at *3 (N.D. Tex. Aug. 5, 2021).

It is the plaintiff's burden to show the proposed putative collective-action members are similarly situated. *Swales*, 985 F.3d at 443 n.65. Courts consider three factors to determine whether proposed putative collective-action members are similarly situated: "(1) the disparate factual and employment settings of the proposed plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each proposed plaintiff; and (3) fairness and procedural considerations." *Torres*, 2021 WL 3419705, at *3. The term "similarly situated" does not mean "identically situated." *Id.* at *4. The district court must instead ask whether the plaintiff has "demonstrated similarity among the individual situations." *Id.* (quoting *Segovia v. Fuelco Energy L.L.C.*, No. SA-17-CV-1246-JKP, 2021 WL 2187956, at *8 (W.D. Tex. May 28, 2021)). This "can be done by showing a factual nexus that binds the plaintiff and the putative collective-action members as alleged victims of a particular policy or practice." *Id.* Some "[d]ifferences between a

4

plaintiff and the putative collective-action members 'will not preclude a collective action unless they are material to ultimate issues before the trial court.'" *Id.* (quoting *Segovia*, 2021 WL 2187956, at \*8). A material distinction, however, can "make a difference relevant to the legal issues presented." *Id.* (quoting *Segovia*, 2021 WL 2187956, at \*8).

The collective action will proceed when the district court concludes the plaintiff and prospective opt-ins are similarly situated. *Swales*, 985 F.3d at 442. If the court finds plaintiff has not established similarity, it can: "(1) decide that the case cannot proceed on a collective basis; (2) decide that it needs further discovery to make the similarly situated determination; or (3) find that certain subcategories of workers should receive notice." *Torres*, 2021 WL 3419705, at \*4. Whether the court issues notice is within its discretion. *See McKnight v. D. Hous., Inc.*, 756 F. Supp. 2d 794, 800 (S.D. Tex. 2010) ("District courts have discretion in deciding whether to order notice to potential plaintiffs. Notice does not issue unless a court conditionally certifies the case as a collective action."); *Valcho v. Dall. Cnty. Hosp. Dist.*, 574 F. Supp. 2d 618, 621 (N.D. Tex. 2008) ("[D]istrict courts may, in their discretion, facilitate notice to potential plaintiffs of their right to opt-in to the suit.").

## 1. The Disparate Factual and Employment Settings of the Proposed Plaintiffs Favors a Similarly Situated Finding

The first factor — disparate factual and employment settings of the proposed plaintiffs — suggests the proposed putative collective-action members are similarly situated. The first factor "assesses the [potential] opt-in plaintiffs' job duties, geographic location, supervision, and salary to determine if the potential opt-ins are similarly situated." *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 739 (W.D. Tex. 2018). "The presence of a common policy, plan, or practice affecting all putative class members, although not required, can be helpful in assessing the first factor." *Vanzzini v. Action Meat Distribs., Inc.*, 995 F. Supp. 2d 703, 721 (S.D. Tex. 2014). "Where

5

there are legitimate differences between putative collective-action members, the first factor does not weigh against a similarly situated finding unless FLSA liability turns on the identified differences." *Torres*, 2021 WL 3419705, at \*5; *see also Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014) ("These are legitimate differences, but [the employer] does not explain why they are material and preclude collective resolution of this case."). Accordingly, "where a plaintiff's claims are based on an employer's allegedly unlawful policy, noted differences between putative collective-action members that do not relate to the policy will not provide a basis for a court to find that the first factor weighs against a similarly situated finding." *Torres*, 2021 WL 3419705, at \*5.

Plaintiff argues the TFAs he proposes be included in a collective action have similar job duties and are subject to the same pay policy. To support this assertion, Plaintiff provides the testimony of two FieldCore employees, Ron Vargas, resource manager for FieldCore, and Fernando Meija, FieldCore's corporate representative. In deposition, Vargas agreed "the general duties or functions [of TFAs] are the same." ECF No. 97 at 17 (quoting ECF No. 97-1 at 5–6). Vargas also agreed TFAs share specific job duties. *See id.* (quoting ECF No. 97-1 at 26–27) (providing an overview of TFAs' management, administrative, and training duties). Meija agreed the Texas-based TFAs "perform similar job duties," although he did not agree the job duties are identical. *Id.* at 18 (quoting ECF No. 27-2 at 19). Plaintiff also highlights Meija's assertion that TFAs share common, specific job duties. *Id.* (citing ECF No. 97-2 at 30–31). Plaintiff further supports his assertion with Vargas's testimony that TFAs in all five subspecialties can work across various energy industries — for instance, oil and gas and power and water — because the equipment TFAs use and manage is largely comparable. *Id.* (quoting ECF No. 97-1 at 10); *see also id.* at 21 (quoting ECF No. 97-1 at 10–11) (highlighting TFAs use the same database to access

documents). Plaintiff concludes these similar job duties — although not identical — are similar enough to permit notice. *Id.* at 19.

Defendant disagrees. It argues the Court should not facilitate notice because the proposed putative collective-action member group "includes 25 job positions, the duties of which vary based on specialty and experience level, spread over 84 work sites, each distinguished by power formation, . . . project need, . . . and projected focus." ECF No. 101 at 18; *see also* ECF No. 101 at 9 ("In reality, the proposed collective spans approximately 317 individuals in 25 different positions divided by specialty, experience, and skill level and whose duties and responsibilities were anything but the same."). Defendant states, "[t]here is no employee at FieldCore who is simply a 'Technical Field Advisor.'" ECF No. 101 at 17. The job duties of members of the proposed putative collective action, Defendant alleges, are not sufficiently similar "to show that proceeding on a collective basis is appropriate." *Id.* at 21.

Defendant highlights some of these differences. For instance, "within the large TFA umbrella, differences abound based on level—while TFA I generally does not lead projects, for example, a TFA IV acts as a project manager." *Id.* at 10. Defendant argues "these various positions[] [are] separated by over a decade of experience and starkly distinguished by the contours of their responsibility[,] . . . [so] they clearly are not" the same job. *Id.* Defendant also argues TFA "duties and experiences differed based on their specialty and segment." *Id.* To do so, Defendant describes a possible project:

> For example, one project may at different points require a mechanical gas turbine TFA at a high level to oversee the entire project, a generator specialist to help out with the generator portion, and a controls engineer to help with the commissioning of the unit. That is because a gas turbine TFA may have more experience overseeing crews that do disassembly, but may not have the requisite knowledge about generators. . . . Based on the specialized nature of the work, a gas turbine or steam turbine TFA is most likely to be leading a project, whereas an excitation, generator

specialist, or controls TFA is more often in charge of certain aspects of a project, but do not stay onsite for the duration of the project.

*Id.* (citations omitted).

Plaintiff also notes all TFAs are paid under the Payment Plan. *Id.* at 14. Plaintiff presents Vargas's testimony to detail the Payment Plan. *Id.* at 14–15; *see also id.* at 15–16 (quoting ECF No. 97-2 at 12–13, 30) (providing Meija's testimony to detail same). Under the Payment Plan, a TFA generally "ha[s] an hours goal of 1650," although some have a smaller goal. *Id.* at 15 (quoting ECF No. 97-1 at 7–8, 12, 16). When a TFA reaches his hours goal, he is given "premium pay, which is [his] weekly salary plus the hours worked at a premium pay number." *Id.* (quoting ECF No. 97-1 at 7–8, 12, 16). Vargas agreed the Payment Plan "is the most popular pay plan . . . among the TFAs" because the plan "provides presumably some guarantee or expectation of what is going to be paid over a specific time frame." *Id.* (quoting ECF No. 97-1 at 7–8, 12, 16). Plaintiff alleges "Texas TFAs customarily work more than 40 hours a week, but they did not receive full and complete overtime compensation for those hours, as a result of FieldCore's XHOUR pay policy." *Id.* at 16. Plaintiff briefly concludes this set of similar facts without providing any more detail, stating this "common pay plan" justifies notice. ECF No. 97 at 17. Defendant does not dispute the proposed members are paid under the Payment Plan itself. *See generally* ECF No. 101. *But see* ECF No. 110 at 24 (stating some proposed putative collective-action members are exempt from FLSA's overtime requirements).

Although differences between proposed putative collective-action members exist, Defendant largely fails to demonstrate differences material to the claim at issue. First, although the TFAs at issue all worked in Texas, they did not work at the same sites throughout the state. Second, some TFAs had supervisory roles or additional experience. Third, TFAs worked in different specialty or subspecialty areas. Fourth, the TFAs were paid different wages. Yet these

8

differences can be separated from the alleged unlawful practice; that is, the failure to pay overtime wages to the TFAs. *See, e.g.*, *Torres*, 2021 WL 3419705, at *6 (stating different job locations, management responsibilities, and wages are issues "separate from the alleged unlawful practice"); *Greinstein v. Granite Servs. Int'l, Inc.*, No. 2:18-CV-208-Z-BR, 2020 WL 6821005, at *8 (N.D. Tex. Nov. 20, 2020) ("[T]he differences between class members' particular responsibilities and duties are not material to the allegations in this case. . . . [Plaintiff] has shown the other aggrieved individuals are similarly situated because they were all subject to a uniform pay scheme which is the only material matter in respect to the claims and defenses asserted.").

"While the plaintiffs must show that they are 'similarly situated,' courts are adamant that this does not mean they must establish that the plaintiffs are identically situated." *Vanzzini*, 995 F. Supp. 2d at 720 (quoting *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *3 (E.D. La. July 1, 2004)). The relevant inquiry is instead "whether this is 'a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice,]' so that hearing the cases together furthers the purposes of Section 16, is fair to both parties, and does not result in an unmanageable trial." *Id.* (quoting *Crain v. Helmerich & Payne Int'l Drilling Co.*, No. 92-0043, 1992 WL 91946, at *2 (E.D. La. Apr. 16, 1992)) (alterations in original); *see also Simmons v. T-Mobile*, No. H-06-1820, 2007 WL 21008, at *8 (S.D. Tex. Jan. 24, 2007) (noting there must be "meaningful 'identifiable facts or legal nexus [that] bind the claims'" (quoting *Aguirre v. SBC Comms., Inc.*, No. H-05-3198, 2006 WL 964554, at *5 (S.D. Tex. Apr. 11, 2006))).

In *Torres v. Chambers Protective Services, Inc.*, the proposed putative collective-action of gate guards had "different supervisors," worked "on different teams," had "some varying job duties," and worked "in different locations." 2021 WL 3419705, at *6. But the court determined

9

those differences did not diminish evidence the employer "did not disperse overtime pay to any individuals who it directly paid for performing gate-guard duties." *Id.* "Thus, . . . the gate guards who were paid directly by [employer] had sufficiently similar factual and employment settings with respect to the issue of whether [employer] failed to disperse overtime pay to support a collective action on that basis." *Id.* And in *Allen v. City of Chicago*, the court found the first factor favored a similarly situated finding. No. 10 C 3183, 2004 WL 5461856, at \*6–7 (N.D. Ill. Oct. 22, 2014). There, the proposed putative collective-action members included persons who had different supervisors and teams of subordinates, diverse job duties, and worked in several locations. *Id.* at \*6. Despite these differences, the court determined "the jobs are sufficiently similar to support a collective action—particularly insofar as they pertain to the alleged unwritten policy, which plaintiffs allege did not vary based on [their] job duties." *Id.* at \*7.

This case is like *Torres* and *Allen*. By contrast, it is not like — as Defendant cites — *Espenscheid v. DirectSat USA, LLC*, where "the evidence show[ed] that opt-in plaintiffs and class members ha[d] different work experiences and were affected by defendants' policies in different ways." No. 09-CV-625-BBC, 2011 WL 2009967, at \*7 (W.D. Wis. May 23, 2011). In *Espenscheid*, the employees at issue "used a variety of methods to record the time on their timesheets." For instance, some employees "recorded time spent in meetings and driving, while others reported that they did not record such time." *Id.* at \*6. "Some [employees] stated that their supervisors did not allow them to record more than 40 hours a week and required them to record a lunch break regardless [of] whether they actually took one; other [employees] stated that they were allowed to record overtime and that they recorded lunch breaks only if they took one." *Id.* Yet to the extent proposed putative collective-action members never "exceeded their annual goal," the Court finds those individuals dissimilar to Plaintiff. ECF No. 101 at 25. As Defendant notes,

10

inclusion of those individuals would be "overbroad" because "[t]hose employees never suffered potential FLSA overtime violations in Texas because . . . none of them worked overtime . . . in Texas." *Id.*; *see also Canaday v. Anthem Cos.*, 9 F.4th 392, 397 (6th Cir. 2021) ("Unless nonresident plaintiffs could demonstrate that their claims arose out of the defendant's contacts with the forum State, personal jurisdiction over the company did not exist, no matter 'the extent of a defendant's unconnected activities in the State.'" (quoting *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1781 (2017))).

The TFAs at issue — although they work in different locations throughout Texas, have different supervisory roles or job experience, work in different specialties or subspecialities, and have varying salaries — are all subject to the same Payment Plan. *See, e.g.*, *Greinstein*, 2020 WL 6821005, at *8. Accordingly, the Court finds the first factor weighs in Plaintiff's favor.

### 2. The Various Defenses Available to Defendant Do Not Indicate the Proposed Putative Collective-Action Members Are Similarly Situated

The second factor — defenses available to the defendant which appear to be individual to each plaintiff — indicates the proposed putative collective-action members are not similarly situated. "Because individualized defenses prevent an efficient proceeding with a representative class, several courts have granted motions for decertification on this basis." *See Reyes v. Tex. Ezpawn, L.P.*, No. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007). "Thus, whether an employee argues that one defense applies to all plaintiffs is beside the point; 'the fact that an individualized inquiry will likely be necessary weighs strongly in favor of decertification.'" *Torres*, 2021 WL 3419705, at *7 (quoting *Clay v. New Tech Glob. Ventures, LLC*, No. 16-296-JWD-CBW, 2019 WL 1028532, at *14 (W.D. La. Mar. 4, 2019)). The district court, however, "has the discretion to determine whether the potential defenses would make the class unmanageable." *Reyes*, 2008 WL 101808, at *5.

11

Defendant argues Trottier, among other possible plaintiffs, were "highly compensated" under FLSA's highly compensated employee ("HCE") exemption and is therefore exempt from FLSA's minimum wage and maximum hour requirements. ECF No. 101 at 22; *see also* 29 U.S.C. § 213(a)(1) (applying requirements to "any employee employed in a bona fide executive, administrative, or professional capacity"). "As with all FLSA exemptions, the employer bears the burden of proof to show – by a preponderance of the evidence – that an exemption 'plainly and unmistakably' applies to the complaining employee." *Gonzales v. Horizontal Wireline Servs., LLC*, No. 5:15-CV-883-DAE, 2017 WL 11068269, at *11 (W.D. Tex. May 30, 2017) (quoting *Meza v. Intelligent Mex. Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013)).

First, to qualify for the HCE exemption, an employee must earn "total annual compensation of at least \$107,432,"[4] of which at least \$684 per week is paid as a salary. 29 C.F.R. § 541.601(a)(1). Second, the employee must "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." *Id.* That is, the employee's primary duties must include performing office or non-manual work. *Id.* § 541.601(d). Despite the duties requirement, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* § 541.601(c). Third, "the employee must be paid on a 'salary basis.'" *Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 290 (5th Cir. 2021). Thus, "earning a certain level of income is necessary, but insufficient on its own, to avoid the overtime protections of the FLSA." *Id.* at 291. Unless all three criteria are met, "the employee is 'not exempt . . . *no matter how highly paid they might be.*'" *Id.* (quoting 29 C.F.R. § 541.601(d)) (alteration and emphasis in original).

---

[4] Before January 1, 2020, the HCE threshold was \$100,000. But when "the annual period covers periods both prior to and after January 1, 2020," as here, "the amount of total annual compensation due will be determined on a proportional basis." 29 C.F.R. § 541.601(a)(2).

An employee is paid on a salary basis when each pay period he receives "a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 264 (5th Cir. 2000). "As a matter of common parlance, we typically associate the concept of 'salary' with the stability and security of a regular weekly, monthly, or annual pay structure." *Hewitt*, 15 F.4th at 291. Yet "we do not ordinarily think of daily or hourly wage earners—whose pay is subject to the vicissitudes of business needs and market conditions—as 'salaried' employees." *Id.* And FLSA regulations define salary as compensation paid "on a weekly, or less frequent basis," "without regard to the number of days or hours worked." 29 C.F.R. § 541.602(a), (a)(1).

Plaintiff's salary is more than $684 per week. *See* ECF No. 97-3 at 7. He received a predetermined weekly salary of $1,586.40. ECF No. 81 at 1; ECF No. 101 at 12 (citing ECF No. 97-3 at 7). And Plaintiff satisfied the HCE exemption's duty test. Plaintiff was responsible for conducting annual inspections of equipment, exercising his stop work authority, and performing variable geometry calibrations. ECF No. 97-3 at 15–29; *see also, e.g.*, *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 360 (5th Cir. 2015) (concluding plaintiff mostly performed non-manual work related to business operations). As a result, the Court finds the HCE exemption applies to Plaintiff.

As for any "reasonable-relationship test" argument parties make, the Court finds the test is of no consequence in this case. *See* 29 C.F.R. § 541.604(b). "An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). "Such additional

13

compensation may be paid on any basis," such as "straight-time hourly amount." *Id.* By contrast, the reasonable-relationship test applies only to an exempt employee whose earnings are "computed on an hourly, a daily, or a shift basis." *Id.* § 541.604(b); *see also Hewitt*, 15 F.4th at 291 (detailing how Section 541.604(b) applies to "daily-rate worker[s]"). That is not the case here: Defendant pays Plaintiff weekly. ECF No. 81 at 1; ECF No. 101 at 12 (citing ECF No. 97-3 at 7); *cf. Hewitt*, 15 F.4th at 292 ("Helix could have easily complied with § 541.604(b)—for example, by offering a minimum weekly guarantee of $4,000 based on Hewitt's daily rate of $963." (quoting *Hewitt v. Helix Energy Sols. Grp.*, 983 F.3d 789, 801 (5th Cir. 2020) (Ho., J., concurring), *vacated on pet. for reh'g en banc*, 989 F.3d 418 (5th Cir. 2020))).

The HCE exemption — however — does not apply to all proposed putative collective-action members, such as Christopher Ward. *See* ECF No. 101 at 15 (citing ECF Nos. 110-19, 110-20, 110-21) ("Unlike Trottier and others noted about, it does not appear that Ward's annualized pay exceeded $100,000."). Consequently, the second factor weighs against a finding that proposed putative collective-action members are similarly situated based on available defenses based on salary discrepancies.

In *JP Morgan & Chase*, the Fifth Circuit determined "it was beyond the district court's discretion to order notice to employees who had signed arbitration agreements and were thus not potential participants of the FLSA collective action." 916 F.3d 494, 504 (5th Cir. 2019). The Fifth Circuit "held that it was improper to refuse to consider evidence about arbitration agreements before sending notice because notice can only go to 'potential participants.'" *Id.* at 502. The Fifth Circuit therefore "concluded that when there is a genuine dispute about an arbitration agreement, the district court 'should permit submission of additional evidence, carefully limited to the disputed facts' before notice is sent." *Id.* at 503. In *Swales*, the Fifth Circuit evaluated an issue that

14

"resembles the issue of arbitration agreements in *JP Morgan*." 985 F.3d at 441. "Just as the existence of a valid arbitration agreement bars an employee from bringing a lawsuit in general, a valid independent-contractor classification bars application of the FLSA." *Id.* That issue was a "potentially dispositive, threshold matter[]." *Id.* Just as the Fifth Circuit "held it was improper to ignore evidence of the arbitration agreements in *JP Morgan*, it's improper to ignore evidence of other threshold matters, like whether the plaintiffs are 'employees' such that they can bring an FLSA claim." *Id.*; *see also Aboin v. Iz Cash*, No. 4:20-CV-03188, 2021 WL 3616098, at *3 (S.D. Tex. June 29, 2021) ("*Swales* directs district courts to determine the merits issue first when it is a dispositive, threshold matter.").

This case is like those cases. The Court finds it likely some — but not all — proposed putative collective-action members may have access to the HCE exemption as a defense. The evidence reveals the HCE exemption applies to Trottier, the named and only plaintiff. Like *Swales*, exemption from FLSA applicability is a "potentially dispositive, threshold matter[]" that is "improper to ignore." *Swales*, 985 F.3d at 441. The Court cannot ignore its notice-based implications either. *Id.* at 442 ("When a district court ignores that it can decide merits issues when considering the scope of a collective, it ignores the 'similarly situated' analysis and is likely to send notice to employees who are not potential plaintiffs."); *JP Morgan & Chase*, 916 F.3d at 502 ("[A]lterting those who cannot ultimately participate in the collective 'merely stirs up litigation,' which is what *Hoffmann-La Roche* flatly proscribes."). "The fact that a threshold question is intertwined with a merits question does not itself justify deferring those questions until after notice is sent out." *Swales*, 985 F.3d at 441. So, the second factor *strongly* weighs against a finding that the proposed putative collective-action members are similarly situated.

### 3. Fairness and Procedural Considerations Indicate Proposed Putative Collective-Action Members Are Similarly Situated

The third factor — fairness and procedural concerns — weighs in Plaintiff's favor because collective treatment would allow for efficient resolution of the proposed putative collective-action members' claims. To evaluate this factor, "courts consider 'the primary objective' of FLSA collective action – '(1) to lower costs to plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity.'" *Segovia*, 2021 WL 2187956, at *11 (quoting *Snively*, 314 F. Supp. 3d at 743). A court may also consider "whether the court 'can coherently manage the class in a manner that will not prejudice any party.'" *Id.* (quoting *Snively*, 314 F. Supp. 3d at 743).

A collective suit by proposed putative collective-action members would lower parties' litigation costs and allow the Court to efficiently resolve common issues of law and fact that pertain to TFAs in one proceeding rather than multiple individual proceedings. *See, e.g.*, *Torres*, 2021 WL 3419705, at *9. Nor does the Court foresee that its management of proposed members will prejudice any party. For these reasons, the Court finds the third factor weighs in favor of a finding that the proposed putative collective-action members are similarly situated.

#### CONCLUSION

The first and third factors used to decide whether a group of proposed putative collective-action members are similarly situated weigh in favor of finding the TFAs are similarly situated. But the second factor does not. The Court finds the proposed FieldCore TFAs are similarly situated to the extent they were paid under the Payment Plan, worked overtime in Texas, and — like Plaintiff — had a "total annual compensation of at least $107,432" during the last three years paid on a "salary basis." 29 C.F.R. § 541.601; *see also Hewitt*, 15 F.4th at 291. As a threshold matter, however, the HCE exemption affords Defendant a defense to Plaintiff's claims that would exempt

FLSA applicability. *See, e.g.*, *Swales*, 985 F.4th at 441. The Court therefore **DENIES** Plaintiff's Motion.

**SO ORDERED**.

March ___, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE